WR-84,247-01
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 11/24/2015 10:58:58 PM
Accepted 11/25/2015 9:32:02 AM
ABEL ACOSTA
CLERK

**IN THE**

**COURT OF CRIMINL APPEALS**

RECEIVED
COURT OF CRIMINAL APPEALS
11/25/2015
ABEL ACOSTA, CLERK

**ORIGINAL WRIT OF**

**MANDAMUS**

**ADRIAN WILSON**

**Appellant,**

**V.**

**THE STATE OF TEXAS**

**Appellee.**

_____

**AUGUSTIN T. PINK**
**Texas Bar No. _____**
**2646 South Loop West #195**
**Houston, Texas 77054**
**Tel. 713.664.6651**
**Fax. 713.664.3242**
**ATTORNEY FOR APPELLANT**

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

IDENTITY OF PARTIES & COUNSEL............................................ii

INDEX OF AUTHORITIES......................................................iii

ISSUES PRESENTED...........................................................1

FACTUAL BACKGROUND .......................................................2

JURISDICTION...............................................................3

STATEMENT OF FACTS.........................................................4

ARGUMENTS ...............................................................10

    ISSUE I:   DOG SCENT DISCRIMINATION LINEUPS WHEN USED AS PRIMARY EVIDENCE ARE LEGALLY INSUFFICIENT TO SUPPORT A CONVICTION.......................................10

    ISSUE II:   INEFFECTIVE ASSISTANCE OF COUNSEL .........22

    ISSUE III.  THE APPLICANT CONTENDS THAT THE EVIDENCE WAS LEGALLY AND FACTUALLY INSUFFICIENT TO UPHOLD HIS CONVICTION.....................................39


PRAYER...................................................................40

_____,

ADRIAN R. WILSON

Appellant,

V.

THE STATE OF TEXAS.

Appellee.

## IDENTITY OF PARTIES & COUNSEL

ADRIAN R. WILSON IS REPRESENTED BY:

**AUGUSTIN T. PINK**
**Texas Bar No. 00784765**
**2646 South Loop West #195**
**Houston, Texas 77054**
**Tel. 713.664.6651**
**Fax. 713.664.3242**
**pinklawfirm@aol.com**

**The State of Texas:**

**ANNA EMMONS**
**Texas Bar No. 24034430**
**Assistant District Attorney**
**1201 Franklin, Suite 600**
**Houston, Texas 77002**
**Tel. 713.755.5800**

# INDEX OF AUTHORITIES

## <u>CASES</u>

U.S. Const. Amend. VI.

..............................................................................................24

*Brooks v. Texas*, 381 F.2d 619, 625 (CA5 1967).

..............................................................................................36

*Bradford v. State*, 516 N.E.2d 45, 49 (Ind. 1987).

..............................................................................................18

*Brott v. State*, 70 Neb. 395, 97 N.W. 593, 594 (1903).

..............................................................................................18

*Buck v. State*, 77 Okla.Crim. 17, 138 P.2d 115, 123 (1943).

..............................................................................................19

*Copley v. State*, 153 Tenn. 189, 281 S.W. 460, 461 (1926).

..............................................................................................19

*Caraway v. Beto*, 421 F.2d 636, 637 (CA5 1970).

..............................................................................................35

*Carter v. Mississippi*, 106 Miss. 507, 64 So. 215, 215 (1913).

..............................................................................................19

*Davis v. Alabama*, 596 F.2d 1214, 1217 (CA5 1979).

..............................................................................................36

Ex parte *Duffy*, 607 S.W.2d 507, 516 (Tex.Cr.App.1980).

........................................................................................35, 36, 37

*Ex parte Ewing*, 570 S.W.2d 941, 947 (Tex.Cr.App.1978).

..........................................................................................35, 36

*Flores v. State*, 576 S.W.2d 632, 634 (Tex.Cr.App.1978).

..........................................................................................35, 36

*Gibbs v. State*, 7 S.W.3d 175, 179 (Tex.App.-Houston [1st Dist.] 1999, pet. ref'd).
................................................................................................35

*Harris v. Estelle*, 487 F.2d 1293, 1299 (CA5 1974).
................................................................................................36

*Herrin v. State*, 125 S.W.3d 436, 443 (Tex.Crim.App.2002).
................................................................................................18

*Herring v. Estelle*, 491 F.2d 125, 128 (CA5 1974).
................................................................................................35

*Hooper v. State*, 214 S.W.3d 9, 13 (Tex.Crim.App.2007).
................................................................................................39

*Jackson v. State*, 877 S.W.2d 768, 771 (Tex.Crim.App.1994)
................................................................................................17

*Kemp v. State*, 892 S.W.2d 112, 115 (Tex.App.-Houston [1st Dist.] 1994, pet. ref'd).
................................................................................................23, 34

*Kelly v. State*, 824 S.W.2d 568, 571-73 (Tex.Crim.App.).
................................................................................................24, 31, 32

*McFarland v. State*, 928 S.W.2d 482, 499-500 (Tex.Crim.App.1996).
................................................................................................22, 23, 33, 34, 35

*Nenno v. State*, 970 S.W.2d 549, 561 (Tex.Crim.App.1998).
................................................................................................33

*People v. Corona*, 145 Cal.Rptr. 894, 911-912, 917-918, 80 Cal.App.3d 684, 724 (1978).
................................................................................................37, 38

*People v. Cruz*, 162 Ill.2d 314, 205 Ill.Dec. 345, 643 N.E.2d 636, 662 (1994).
................................................................................................18

*Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932).
...................................................................................35, 36

*Rummel v. Estelle*, 590 F.2d 103, 104 (CA5 1979), aff'd. on other grounds, 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980).
...................................................................................36

*Sanders v. State*, 119 S.W.3d818, 820 (Tex.Crim.App.2003).
...................................................................................39

*Smith,* — S.W.3d—, 2011 WL 480600, at *3.
...................................................................................33

*Smotherman v. Beto*, 276 F.Supp. 579, 590 (N.D.Tex.1967).
...................................................................................36

*State v. Cheatham*, 458 S.W.2d 336, 339 (Mo. 1970).
...................................................................................19

*State v. Green*, 210 La. 157, 26 So.2d 487, 489 (1946).
...................................................................................19

*State v. Loucks*, 98 Wash.2d 563, 567, 656 P.2d 480, 482 (1983).
...................................................................................11, 19, 30

*State v. Smith*, 335 S.W.3d 706 (Tex.Crim.App.-Houston [4th Dist.] 2011.
...................................................................................24

*State v. Storm*, 125 Mont. 346, 238 P.2d 1161, 1181-82 (1952).
...................................................................................18

*State v. Taylor*, 118 N.H. 855, 395 A.2d 505,507 (1978).
...................................................................................19

*State v. Turro*, 867 S.W.2d 43, 47 (Tex.Crim.App.1993).
...................................................................................39

*Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed. 674 (1984).

..................................................................22, 23, 33, 34
*Thompson v. State*, 9 S.W.3d 808, 812 (Tex.Crim.App.1999).
..................................................................23, 34
*Urbano v. State*, 837 S.W.2d 114, 116 (Tex.Crim.App. 1992), *superseded in part on other grounds*.
..................................................................19

*Watson v. State*, 204 S.W3d 404, 414-15 (Tex.Crim.App.2006).
..................................................................39, 40

*Weatherred*, 15 S.W.3d—, 2011 WL 480600, at 3, (Tex.App.-Houston 14th Dist.] Feb. 10, 2011, no pet.
..................................................................32

*Williams v. Beto*, 354 F.2d 698, 702-703. 705 (CA5 1965).
..................................................................35, 36

.
*Williams v. State*, 235 S.W.3d 742, 750 (Tex.Crim.App.2007).
..................................................................18

*Winfrey v. State*, 323 S.W.3d 875, 882-83 (Tex.Crim.App.2010).
..................................................................10, 11, 27, 28

*Winston v. State*, 78 S.W.3d at 526, 27 and 561.
..................................................................33

## RULES

Tex. Rules of Evidence 702 (Testimony by Experts).
..................................................................23

## TREATISE AND LAW REVIEW

Andrew E. Taslitz, *Does the Cold Nose Know? The Unscientific Myth of Dog Scenting*, 42 Hastings L.J. 15, 42 (1990).
..................................................................9, 28

42 HASTINGS L.J. 15, 42 (1990).
..................................................................28

# ISSUES PRESENTED

ISSUE I:  DOG SCENT DISCRIMINATION LINEUPS WHEN USED AS PRIMARY EVIDENCE ARE LEGALLY INSUFFICIENT TO SUPPORT A CONVICTION.............................................................................. 10

ISSUE II:      INEFFECTIVE ASSISTANCE OF COUNSEL ............................... 22

ISSUE III.    THE APPLICANT CONTENDS THAT THE EVIDENCE WAS LEGALLY AND FACTUALLY INSUFFICIENT TO UPHOLD HIS CONVICTION........................................................................... 39

1

## FACTUAL BACKGROUND

On October 21, 2006, it was alleged that Appellant and the eighteen-year-old complainant, Adrian Guillory, argued while outside an apartment complex in Houston. Appellant pulled out a gun and shot Guillory at least seven times, killing him.

At trial, the State presented several witnesses, including Marcus Wright and his cousin Ashton Winters. Both Wright and Winters testified that they saw Appellant shoot Guillory. Winters also testified that Appellant came to his apartment afterward and directed him to hide the gun used in the shooting; Appellant also threatened to kill Winters and his family if he told anyone what he had done. However, both Appellant and another witness, Hershel Cartwright, testified that it was Marcus Wright, not Appellant, who shot Guillory.

## JURISDICTION

Appellant was Indicted and charged with Offense of Murder of Adrian Wayne Guillory, alleged to have occurred in Harris County, Texas, on or about October 31, 2006 (T. 10).

On May 7, 2007, the Court started jury selection to select a jury of twelve (12) people. The Rule was invoked (Sf., p. 8, 1. 21, Vol. III of IX).

## STATEMENT OF FACTS

Appellant was charged with the Offense of Murder alleged to have occurred in Harris County, Texas, on or about October 31, 2006.

A witness, Marcus Eugene Wright, told the investigating Houston Police Officer, B. E. Rogers, that he had known Appellant for several years and that Appellant had called him for a ride prior to the alleged murder occurred. Upon arrival to the location where Appellant was, the witness, Mr. Wright, stated that he saw Appellant and the Complainant in a verbal argument in the back of an apartment complex located at 7402 Calhoun. The witness assumed the argument was over drugs and or money. According to the witness, Appellant then pulled a pistol from his right rear pants pocket and fired a shot into the Complainant's chest. He saw the Complainant fall backwards onto the ground. The witness, Mr. Wright, then turned and ran back to his car and, while doing so, heard several more gunshots. The Complainant died of multiple gunshot wounds.

A photo array of six people was presented to the witness, Mr. Wright, immediately identified Appellant as the shooter.

The State's first witness was Houston Police Department's Officer Michael Houston. He testified that he was on patrol when he heard three gunshots. Officer Houston stated that all three shots were very quick one constant shooting, no

pauses between them (Sf., p. 19, 1. 14-17, Vol. III of IX). He arrived at the shooting location and found the deceased lying in the grass between two apartment buildings. After EMS arrived the Complainant was pronounced dead. Officer Houston notified Houston Police Department's Homicide Division. Several shell casings, belt, gold teeth, blood spots and a rifle was found (Sf., p. 25, 1. 1-7, Vol, III of IX).

The State's Second Witness was Marcus Wright. Mr. Wright testified outside the presence of the jury that he pleaded guilty in 2004 to the Felony Offense of Theft from a Person. A witness against him in that felony theft was the Complainant being a witness against him until a few days prior to testifying in this case. The State objected to any testimony along these lines because there wasn't any evidence that Mr. Marcus Wright knew that the Complainant was a witness. The Court stated that questions regarding that couldn't be asked (Sf., p. 31, 1. 9-14, Vol. III of IX).

The State's Third Witness was Royce Maza. This witness testified that he worked for Kimmons Security Services. The company installs camera systems with digital video recorders in apartment complexes. A video digital compact disc was admitted into evidence through this witness.

The State's Fourth witness was Officer Robert Gutierrez with Houston Police Department's Crime Scene Unit (Sf., p. 76-77, Vol. III of IX). He testified about the crime scene and recovered items of evidence.

The State's Fifth witness was Sergeant David Crain with the Houston Police Department's Homicide Division. He testified that the Chevrolet Cobalt vehicle seen leaving the crime scene was a Avis Rent A Car and rented to Mr. Pierson. Upon contact, Mr. Pierson told him that he rented it for his daughter and his grandson, Marcus Wright (Sf., p. 11, 1. 15-24, Vol. IV of IX). He further testified that Marcus Wright and an individual named Markesha, that Marcus Wright was with on that night, came in to the Homicide Division. He testified that Marcus Wright told investigators the murder weapon was located in Ashton Winters' apartment. The investigators went to the apartment, got permission to search, and found the murder weapon between the mattresses of a bed wrapped in a shirt (Sf., p. 24, 1. 20, Vol. IV of IX), (Sf., p. 25, 1. 6-16, Vol. IV of IX).

The State's Sixth witness was Doctor Dwayne Wolf who is the Chief Deputy with the Harris County Medical Examiner's Office. He testified that the deceased was killed by multiple gunshots to the body, but he was not the doctor that performed the autopsy.

The State's Seventh witness was Officer Michael Perez with the Houston Police Department's Homicide Division. He testified that he was present when the

murder weapon was recovered at Ashton Winter's apartment (Sf., p. 60, 1. 5-20, Vol. IV of IX), and he was not able to obtain any fingerprints from the weapon.

The State's Eighth witness was Ashton Winters. He testified that he and Appellant went to middle and high school together (Sf., p. 65, 1. 15-18, Vol. IV of IX) and that he was friends with the Complainant and Marcus Wright. He testified that he received a call from Marcus Wright stating that Appellant and the Complainant were having a confrontation (Sf., p. 70, 1. 15-20, Vol. IV of IX). He saw and heard A. G. (the Complainant) "getting really upset, really angry just saying I need my money or I need my product" (Sf., p. 71, 1. 17-18, Vol. IV of IX). He did not see the Complainant possessing any weapon. He sees Appellant pull out his gun and fire it one time and he (Ashton Winters) took off running to his apartment. As he was running, he heard six or seven more shots (Sf., p. 73, 1. 5-20, Vol. IV of IX). Once Winters got to his apartment, Appellant came to his apartment's door and that is when Appellant gave him the gun. Mr. Winters then wrapped the gun in a shirt and placed it in his bed (Sf., p. 74, 1. 1-5, Vol. Iv of IX). He further testified that Appellant stayed and told him if you tell I will kill you and your family (Sf., p. 74, 1. 18-14, Vol. IV of IX). He identified Appellant in Court as the person who shot the Complainant.

The State's Ninth witness was Sergeant Bobby Roberts with the Houston Police Department's Homicide Division. He testified about dog scents, the gun

and that he took witness statements. The State's Tenth witness was Deputy Keith Pickett with the Fort Bend County Sheriff's Department. He testified that he was a K-9 officer. His dogs were used to identify the scent on the murder weapon as the scent of Appellant.

The State's Eleventh witness was Officer Michael Lyons a Firearms Examiner with the Houston Police Department's Forensic Firearms Laboratory for analysis of casings and bullets from the crime scene. Both the casings and fired bullets were from the murder weapon.

The State's Twelfth witness was Melissa Edmond who is the sister of the Complainant, Adrian Guillory, and she testified that the gold grill (for teeth decoration) found at the crime scene was that Complainant's.

The State rested (Sf., p. 148, 1. 17-21, Vol. IV of IX).

After the State rested, Appellant called his First witness, Hershel Cartwright. He testified that he is eighteen years of age and is from the Wesley Square Apartments area and knows the Complainant, Marcus Wright, Ashton Winters and Appellant. He testified that he saw a fight between Marcus Wright and the Complainant (Sf., p. 156, 1. 19-23, Vol. IV of IX) and then he saw Marcus Wright holding a gun and shoot the Complainant (Sf., p. 107, 1. 3-6, Vol. IV of IX). After he saw this, he was in shock and ran to his house.

Appellant's Second witness was himself. He testified that he saw the Complainant give Marcus Wright a Hundred Dollars (Sf., p. 7, 1. 20-25, Vol. V of IX) and then Marcus Wright refused to give the Complainant marijuana and then subsequently shoot Marcus Wright.

The Defense rested and the case went to the Jury and the Jury found Appellant guilty of murder.

## ISSUE I: DOG SCENT DISCRIMINATION LINEUPS WHEN USED AS PRIMARY EVIDENCE ARE LEGALLY INSUFFICIENT TO SUPPORT A CONVICTION.

It has been well established in our courts that a conviction cannot be upheld when the primary evidence was based on dog scent discrimination lineups. In said case, the State relied heavily on Deputy Pickett's testimony and evidence that he presented. Deputy Pickett was the State's expert witness on dog scent lineups and also as the person that handled the scent lineup in the appellant's case. Officer Pickett testified to his ability and knowledge as a dog handler and his dogs flawless trade record on aiding the police department in getting convictions in difficult cases where there was only a scent remaining at the crime scene.

In *Winfrey v. State*, 323 S.W.3d 875, 882-83 (Tex.Crim.App.2010) the Texas Court of Criminal Appeals rejected the rationale that scent-discrimination lineups are a legitimate scientific field because they are similar to scent tracking, noting that there are "significant scientific differences among the various uses of scenting," quoting Andrew E. Taslitz, *Does the Cold Nose Know? The Unscientific Myth of Dog Scenting*, 42 Hastings L.J. 15, 42 (1990)). The Winfrey court held that scent-discrimination lineups, used alone or as the primary evidence in a case, are legally insufficient to support a conviction. *Id.* 883-84.

The court has held that when evidence is obtained from a dog-scent lineup, its role in the courtroom is merely supportive." *Winfrey* 323 S.W.3d at 884 (quoting *State v. Loucks*, 98 Wash.2d 563, 567, 656 P.2d 480, 482 (1983)). The court specifically held "scent-discrimination lineups ... to be separate and distinct from dog-scent tracking evidence." *Id.* at 883. We did not say that dog scent lineup evidence must be corroborated to be legally sufficient evidence of guilt, but rather that such evidence "is merely supportive" of the remainder of the evidence. As merely supportive evidence, dog-scent lineup evidence cannot itself constitute sufficient evidence of guilt.

The State presented Deputy Pickett's testimony to the jury as its main source of evidence that could positively identify Mr. Wilson as the only person that committed this crime. The State introduced Deputy Pickett as the leading expert in the field of scent discrimination lineups in Harris County, Texas and surrounding areas. The State argued that Deputy Pickett's testimony is most reliable due to his many years of experience in this area, his successful track record in solving cases and his many convictions in murder cases. The State also presented to the jury that Deputy Pickett and his teams of dogs were never wrong in the scent-lineups. Once the dogs found the scent that matched, they were one hundred percent sure that they had the right person as seen from testimony of Deputy Pickett.

P. 117; Testimony of Deputy Pickett:

11

Q. And Deputy Pickett, who do you work for?
A. Fort Bend County Sheriff's Department.

A. I'm a dog handler. K-9 officer.
Q. Okay. What type of training and experience do you have in order to be a K-9 officer?
A. Well, I started doing this before I became a peace officer. I started working with the dogs in 1989 and they're bloodhounds, and I started training. I went to the – like a hundred and seventy-six hours of seminar training working bloodhounds and doing various things with them. I train my own dogs, so.
Q. Okay. Have you – how long have you been training dogs?
A. Since 1989.
Q. Okay. And have you written any books or articles concerning bloodhounds?
A. Yes.
Q. Okay. Have you had the opportunity to testify

P. 118; Testimony of Deputy Pickett:

as an expert before?
A. Yes.
Q. And has that happened here in Harris County?
A. Yes.
Q. As well as other counties?
A. Yes.
Q. Has that been on few or many occasions?
A. I've always been declared an expert.

Q. Okay. Have you trained bloodhounds as well as handlers before?

Page 119; Testimony of Deputy Pickett:

A. I've trained bloodhounds, you have to kind of work them as a team. They have to learn how to do this together. So, I've trained officers and dogs for Houston and Galveston and Bellaire and Dallas and Texas

12

Parks and Wildlife.

A. Yes, we frequently do stuff for the FBI and ATF and DEA. We're not doing drugs for the DEA, we do some other stuff, but we do stuff for US Marshals and Texas Rangers on a regular basis and lots of county agencies.

Q. Can you tell the jury about a couple of your cases?

A. Well, we did all the Resendez Rameriz cases in Texas. The lineups that we're going to talk about in this case, the dog identified after the Benton case, when we collected sent, the dog identified every one of his homicides and then identified other homicides which he wasn't connected with, so he was right on all of those. I don't know, we've done a lot of national FBI cases. We are the first people called in to look for Eric Rudolph and the Olympic bomber, abortion clinic, whatever, the guy over there. We do cases, you know, all over the place.

Page 123; Testimony of Deputy Pickett:

Q. And have you been certified as an expert on bloodhound training – trailing?

A. Yes.

Q. Have you ever had appeals court rulings done on dog lineups?

A. Yes, I've had two, the 14th Appellate and 9th Appellate Court unanimously ruled in favor.

Page 124; Testimony of Deputy Pickett:

A. There's Quincy and she's a 10-year old female bloodhound, and these are AKC bloodhounds. And she started doing lineups – she was born in '97, ad she started doing lineups in '99. And she's run 942 felony trails and 1215 scent lineups that we did in this case. And James Bond is two and a half years old; and he started doing these lineups in 2004. He's run 230 felony trails and 700 lineups.

13

Page 126; Testimony of Deputy Pickett:

Q. On October 23rd, Monday, were you contacted by Sergeant Roberts?

A. Yes.

Q. And did you meet up with Sergeant Roberts in Bellaire?

A. Yes.

Page 127; Testimony of Deputy Pickett:

Q. And what did – what did you run first?

A. Let me say this: That I have the extra scent pads, I have hundreds of scent pads of, pick a race and a sex, most of them are criminals, so, I have scent pads. So, we have fillers, and that's where they're

Page 130; Testimony of Deputy Pickett:

Q. Okay. Deputy Pickett, did you later learn who was in – whose scent was in the can when James Bond hit on No. 3?

A. Yes, I didn't even take names. Once we're all done, I went out and collected the names from everybody who was in all six positions. And that was when Officer Roberts told me that the guy in Position 5 was who he was, and that was the potential suspect.

Q. Okay. Whose name, what was the name in Position 3 and in Position 5 that your dogs alerted on

(A) Adrian Wilson

The state also offered the testimony of Sergeant Bobby Roberts, the lead homicide investigation assigned to the Applicant's case, to confirm who actually handled the pistol that was used in the murder. Sergeant Roberts believed that Adrian Wilson was the actual person that had the gun in his hand. Sargent Roberts

14

also testified that he trusted and relied on the results of Deputy Pickett and his bloodhounds. Sergeant Roberts also testified that because of conflicting accounts and statements that he only knew of only one way to solve this problem that was to rely on scent discrimination lineup, the bloodhounds would be the key factor.

Sergeant Roberts testified as to the following:

Page 98; Testimony of Sergeant Roberts:

Q. Now, once the weapon is located, did you have any contact with that weapon?
A. Later, yes, I did, later.

Q. All right. And how did you have contact with it?
A. Working up in homicide. I've learned one of the best tools that I have available to me is a deputy that works in Fort Bend County that is trained with bloodhounds. That's what he does, nothing else but bloodhounds. And their sole purpose is linking people to crime scenes through scent, you know, dogs smelling people's scent. So, the information that I had was that Adrian Wilson was the shooter; therefore, Adrian Wilson had to have touched the gun. So, I wanted to make sure that I could link him by his smell to the gun. So, I contacted Deputy Pickett.

Page 99; Testimony of Sergeant Roberts:

Q. And did you and Deputy Pickett eventually meet?
A. Yes, we did. I went to the firearms lab, obtained the weapon from Michael Lyons, who is the firearms guy. I took the weapon with me, and I had a scent sample for Wilson and met with Pickett so that he could do a lineup.

Page 100; Testimony of Sergeant Roberts:

15

A. I explained to Deputy Pickett what I wanted to do, and a scent lineup is conducted the same way a person lineup is. Just like you see on television where six people are standing and somebody walks in and points, this is him. Well, in a scent lineup, I guess, you can call it coffee cans, he has coffee cans and the cans are numbered 1 through 6.

Page 101; Testimony of Sergeant Roberts:

A. Further involvement in the case?

A. No, the only thing I did was I had the T-shirt that was wrapped around the gun when it was found, and I had the gun. So, my job was to just let the dog smell it, and then it would go and then I did -- I think, I did the T-shirt first and the gun second or vice versa.

Page 105; Cross-examination of Sergeant Roberts:

Q. Happening at the same time, okay. All right. Let's talk about the dog scent test for a second. You yourself, Sergeant, are not an expert in handling these dogs, are you?

A. No, sir.

Page 106; Cross-examination of Sergeant Roberts:

Q. And officer – what's his name that you referred to, again, that's the dog handler?

A. Deputy Pickett.

Q. So, Deputy Pickett is actually the expert?

A. He's an expert and I'm a believer.

Q. But you have gotten Deputy Pickett's assistance with regard to handling these?

A. On many occasions, sir.

Q. On many occasions?

Q. Right And would you say that the dogs were

16

always right in your experience?

A. I would say in the cases that I've had, yes.

If you want an explanation, the first case that I had was sexual assault. I used to work sexual assault cases. I knew that the person I was looking at had handled two items that I had in my possession, so I figured, well, if the dog doesn't tell me that he had handled these items, then it must not be true. And sure enough, it was a process of confirming.

In the present case, Deputy Pickett's testimony was not merely relied on to help support the prosecution's case but the State's sole and key source in convicting the Applicant. The State presented Deputy Pickett's testimony to the jury as its main source of evidence that could positively identify Mr. Wilson as the only person that committed this crime. The State also presented Sergeant Roberts, to show that the Appellant handled the gun. However, Sergeant Roberts used the evidence provided through the scent discrimination lineup by Deputy Pickett as the primary evidence to base his conclusions.

In *Jackson v. Virginia*, 443 U.S. at 319, 99 S.Ct. 2781, the legal-sufficiency standard requires the reviewing court to view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson*, 443 U.S. at 319, 99 S.Ct. 2781. At most, the evidence here shows: (1) appellant indicated that he believed he was the number one suspect in a murder investigation; (2) appellant shared information with Campbell that appellant

17

claimed to have heard about the murder; and (3) appellant's scent was on the victim's clothes. It is the obligation and responsibility of appellate courts "to ensure that the evidence presented actually supports a conclusion that the defendant committed the crime that was charged." *Williams v. State*, 235 S.W.3d 742, 750 (Tex.Crim.App.2007). Furthermore, "[i]f the evidence at trial raises only a suspicion of guilt, even a strong one, then that evidence is insufficient [to convict]." *Urbano v. State*, 837 S.W.2d 114, 116 (Tex.Crim.App. 1992), *superseded in part on other grounds*, *Herrin v. State*, 125 S.W.3d 436, 443 (Tex.Crim.App.2002). Based on our review of this record, the court found that the evidence, even when viewed in the light most favorable to the verdict, merely raises a suspicion of guilt and is legally insufficient to support a conviction of murder beyond a reasonable doubt. Therefore found the evidence legally insufficient.

Cases involving the use of dogs, usually bloodhounds, to track humans are abundant and the law is well settled in regards to admissibility of such evidence with only a minority of courts outright rejecting bloodhound evidence. *People v. Cruz*, 162 Ill.2d 314, 205 Ill.Dec. 345, 643 N.E.2d 636, 662 (1994); *Bradford v. State*, 516 N.E.2d 45, 49 (Ind. 1987); *State v. Storm*, 125 Mont. 346, 238 P.2d 1161, 1181-82 (1952); *Brott v. State*, 70 Neb. 395, 97 N.W. 593, 594 (1903). Fewer courts have addressed the question of whether dog evidence is sufficient to

18

sustain a conviction when it is the only evidence. However, as early as 1913, our colleagues at the Supreme Court of Mississippi held that dog tracking evidence, alone and unsupported, to be insufficient to affirm a conviction. *Carter v. Mississippi*, 106 Miss. 507, 64 So. 215, 215 (1913). And as recently as 1983, the Supreme Court of Washington agreed. *State v. Loucks*, 98 Wash.2d 563, 656 P.2d 480, 483 (1983). In fact, our research suggests the courts that have passed on this issue have concluded that dog-scent evidence, when admissible, is insufficient, standing alone, to sustain a conviction. *State v. Taylor*, 118 N.H. 855, 395 A.2d 505,507 (1978); *State v. Cheatham*, 458 S.W.2d 336, 339 (Mo. 1970); *State v. Green*, 210 La. 157, 26 So.2d 487, 489 (1946); *Buck v. State*, 77 Okla.Crim. 17, 138 P.2d 115, 123 (1943); *Copley v. State*, 153 Tenn. 189, 281 S.W. 460, 461 (1926).

The Applicant contends that the prosecution did not use the evidence or testimony of the scent discrimination lineup in his trial as merely supportive or as corroborating evidence but used it as primary evidence and relied significantly on the scent lineup, that during their closing argument they stated that the bloodhounds was proof that the Applicant was the person that had the murder weapon and the person guilty of the murder. In the prosecution's closing, Ms. Emmons conceded that there were conflicting testimony from key witnesses but the dogs had nothing to gain in this case like the other witness nor had a motive to

lie. That the bloodhounds were the innocent party therefore should be believed. In closing arguments, the prosecution states the following:

Page 63; Closing arguments by Ms. Emmons:

MS. EMMONS: Ladies and gentlemen, the only thing consistent with the Defendant's story is that it's all a lie. He lied to the police on October 21st, and he came in here and he lied to you today. And I'm going to show you and prove to you that he lied to you. When the Defense comes up with a theory and their client is saying I didn't do it, or that's what they decide to go with, what do they have to do? Look at who to point the finger to, right? It's pretty easy. They had two choices in this case. Are we going to point it at Ashton or we going to point it at Marcus? But their client kind of messed that up a little bit when he talked to the police because he said Ashton was across the street and Ashton didn't do anything. So, they were left with one choice, Marcus Wright. I tell you, they give Marcus a lot of credibility. I mean, is he really

Page 64; Closing arguments by Ms. Emmons:

that smart to know that Sergeant Roberts is going to get the bloodhounds out there? Is he really to know that this guy's scent is on the gun? No way. No way is that going to happen. Now, what do you have?

Page 70; Closing arguments by Ms. Emmons:

Sergeant Crain and Sergeant Roberts interview Marcus, Ashton, Markesha, people at the scene, look at the physical evidence. And well over 40 years of experience, they come in here and they say, there's your shooter, over 40 years. And they based it on everything that we're talking about; and they base it on

20

Deputy Pickett, too. Deputy Pickett comes in and he tells you about the blooddhounds, and you know that that bloodhound has nothing to gain. It's going to get its food either way. And he doesn't hit on that shirt. And that's important because that corroborates Ashton.

Because the State's primary evidence to convict the Appellant was based upon Deputy Pickett's dog scent evidence, this case should be reversed and remanded.

## ISSUE II: INEFFECTIVE ASSISTANCE OF COUNSEL

The Applicant is asking for this Honorable Court to abate and reverse his conviction based on the fact that the Applicant's defense counsel rendered him ineffective assistance of counsel during his trial. The Applicant states that his defense attorney failed to challenge the prosecution's key evidence which was the scent discrimination lineup and the testimony of Deputy Pickett, the prosecution's expert witness on scent lineup in the Applicant's case. The Applicant further states that because of this failure to challenge or to object to the evidence presented due to the scent lineup and Deputy Pickett's testimony, the Applicant was convicted of murder.

The proper standard by which to gauge the adequacy of representation by counsel is articulated in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed. 674 (1984). See also *McFarland v. State*, 928 S.W.2d 482, 499-500 (Tex.Crim.App.1996). To determine whether counsel's representation was so inadequate as to violate a defendant's Sixth Amendment right to counsel, an appellant must first show that counsel's performance was deficient, i.e., that his assistance fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068; *McFarland*, 928 S.W.2d at 500. Second, assuming an appellant has demonstrated deficient assistance, he must also affirmatively prove prejudice. See *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068; *McFarland*, 928

22

S.W.2d at 500. In other words, an appellant must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068; *McFarland*, 928 S.W.2d at 694, 104 S.Ct. at 2068; *McFarland*, 928 S.W.2d at 500. A "professionally unreasonable" error by trial counsel does not require a reversal if the error had no effect on the direct appeal to show that trial counsel's performance was deficient. *Gibbs v. State*, 7 S.W.3d 175, 179 (Tex.App.-Houston {1ˢᵗ Dist.} 1999, pet. ref'd). An appellant must prove ineffective assistance by a preponderance of the evidence. *McFarland*, 845 S.W.2d at 843.

A reasonable probability is a probability sufficient to undermine confidence in the outcome. *McFarland v. State*, 845 S.W.2d 824, 842-43 (Tex.Crim.App.1992). In any case rendering ineffective assistance of counsel, we begin with the strong presumption that counsel was effective. See *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065; *Jackson v. State*, 877 S.W.2d 768, 771 (Tex.Crim.App.1994). The appellant has the burden of rebutting this presumption. *Thompson v. State*, 9 S.W.3d 808, 812 (Tex.Crim.App.1999); *Kemp v. State*, 892 S.W.2d 112, 115 (Tex.Crim.App.-Houston [1st Dist.] 1994, pet. ref'd). To do so, the appellant must (1) identify the acts or omissions that are alleged to constitute ineffective assistance, and (2) affirmatively prove they fall below the professional norm for reasonableness. *McFarland*, 928 S.W.2d at 500. Any allegation of

23

ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Id.*

In this point of error, Applicant alleges he received ineffective assistance of counsel at trial because his counsel did not object to the testimony of Deputy Pickett regarding the police bloodhound. See U.S. Const. Amend. VI (Right to Counsel), Tex. Rules of Evidence 702 (Testimony by Experts); *Kelly v. State,* 824 S.W.2d 568, 571-73 (Tex.Crim.App.). The Applicant alleges that by his counsel's ineffectiveness as defense counsel, he received irreparable harm when he failed to object to Deputy Pickett's trial testimony. It has been proven that Deputy Pickett's testimony as an expert in the field of scent discrimination lineups was unreliable and untrustworthy and that the bloodhound dogs in question are not certified to recognized industry standards. If counsel would have done any investigation, he would have found that Deputy Pickett's testimony in several case was determined unreliable. In *State v. Smith,* 335 S.W.3d 706 (Tex.Crim.App.-Houston [4th Dist.] 2011. Deputy Pickett's training and testimony was found to be unreliable and discredited. Smith filed a pre-trial motion for discovery, production, and a Kelly hearing on the scent evidence. At the hearing on Smith's motion, conducted on September 12, 2007, Deputy Pickett testified that he was a certified peace officer and had been a canine handler with the Fort Bend Sheriff's Department for nine-and-a- half years. Deputy Pickett described his experience in working with

24

bloodhounds and his dog's experience in detecting scents, as well as the scent lineup he conducted in July 2005, a procedure which occurred with Smith's legal counsel present. The trial court denied Smith's motion to suppress the scent lineup evidence.

Smith filed a motion to exclude all testimony and evidence in connection with the scent lineup. At a hearing on April 2, 2009, the trial court addressed Smith's motion and found the scent lineup evidence admissible and relevant. Several months later, on September 9, 2009, the trial court held a non-evidentiary hearing on Smith's motion to reconsider the ruling on the scent lineup evidence. In this motion, Smith alleged the following:

- Deputy Pickett has committed perjury related to his education in two other court proceedings;
- Deputy Pickett's scent discrimination lineups have been proven wrong in other cases;
- Deputy Pickett has been ruled unreliable by another trail court of the same jurisdiction; and
- Dog scent evidence has been proven wrong and unreliable in other jurisdictions in the country.

In support of his motion, Smith offered a bench memorandum with exhibits attached, but the trial court indicated that it was considering only legal arguments at the hearing and no testimony or other evidence was presented. The trial court orally granted Smith's motion for reconsideration and ruled that the scent lineup evidence would be excluded, effectively setting aside the court's previous ruling of September 12, 2007.

25

In response to the State's request, the trial court entered the following findings of fact from the September 12, 2007 hearing:

1. Keith Pickett testified that there was a possible cross-contamination of the scents in the lineup in question;
2. Keith Pickett did not run a "blind" scent lineup in the instant case without the defendant.
3. Keith Pickett does not keep complete records on the scent lineups that his dogs have participated in'
4. Keith Pickett's training records regarding the dog's training are incomplete;
5. Keith Pickett's failure to maintain records makes it difficult to determine accuracy or error rates;
6. Keith Pickett's "records" were not subject to peer review;
7. Keith Pickett failed to follow up on the dispositions of cases in which his dogs participated;
8. Keith Pickett failed to perform validation testing on his dogs during scent lineups;
9. Keith Pickett testified that no one is reviewing his work;
10. The bloodhound dogs in question are not certified and there is no recognized industry standard on bloodhounds and no certification program for bloodhounds;
11. While the idea that bloodhounds can track and identify scents is accepted as valid, there is no clearly accepted method for conducting scent lineups;
12. No literature was offered by the State in support of the manner in which the scent lineup in question was conducted;
13. No independent evidence was presented by the State regarding the potential rate of error;
14. No evidence was presented by the State regarding the availability of other experts to test and evaluate the manner in which the scent lineup in question was conducted;
15. The defense presented evidence that the dogs in question could be intentionally or unintentionally influenced by the dog handler because the manner in which the scent lineup in question was conducted;
16. There was no showing that the scent lineup results could be duplicated by others following the same methods.

The trial court entered an order on October 23, 2009, excluding the testimony of Deputy Pickett. The State filed a motion to reconsider the ruling and provided documents for support. The trial court denied the State's motion. The State then appealed, asserting that the trial court erred in excluding Deputy Pickett's testimony regarding the scent lineup.

In *Winfrey v. State*, 291 S.W.3d 68, 75 (Tex.App.-Eastland 2009), to assist in the investigation, Texas Ranger Grover Huff contacted Deputy Keith Pickett, a dog handler with the Fort Bend County Sheriff's office. Deputy Pickett testified about a "scent lineup" that he conducted nearly three years after the murder in August 2007. He used his three bloodhounds, Quincy, James Bond, and Clue. This involved obtaining scent samples from clothing that the victim was wearing at the time of his death and from six white males, including appellant. The dogs were "pre-scented" on the scent samples obtained from the victim's clothing. The dogs then walked a line of paint cans containing the scent samples of six white males. All three dogs alerted on the can containing appellant's scent sample.

Based on this, Deputy Pickett concluded that appellant's scent was on the victims clothing. Deputy Pickett testified on cross-examination that an alert only establishes some relationship between the scent and objects and that scent detection does not necessarily indicate person-to-person contact. Deputy Pickett also testified on cross-examination that his understanding of the law was that

convicting a person solely on a dog scent is illegal.

Appellant complained on direct appeal that the evidence is legally and factually insufficient to support a conviction of murder. In its published opinion affirming the trial court, the court of appeals addressed the sufficiency of the evidence in a two-paragraph analysis. Concluding that the evidence was legally and factually sufficient, the court of appeals specifically found: (1) Deputy Pickett's canine-scent testimony provided direct evidence placing appellant in direct contact with Burr's clothing; (2) the jury could have reasonably concluded that appellant was in Burr's house at the time of the murder and that he had significant physical contact with Burr; (3) appellant shard information about the murder with Campbell that was not known, even by police; and (4) appellant identified himself as the "number one suspect" in the murder at a time when the police did not consider him a suspect. *Winfrey v. State*, 291 S.W.3d 68, 75.

This court stated however, there is no proof positive that appellant came in contact with the victim. Even when viewed in the light most favorable to the verdict, the dog-scent lineup proves only that appellant's scent was on the victim's clothes, not that appellant had been in direct contact with the victim, as the court of appeals decided. The appellate court ruled and stated that it cannot be denied that the jury and the court of appeals found the dog scent lineup evidence in this case to be compelling. In 2004, two different dogs alerted only to the scents of

appellant's son and daughter. In 2007, three different dogs alerted only to appellant's scent. But, the question essentially presented in this case was whether dog scent lineup evidence alone could support a conviction beyond a reasonable doubt. And, while the evidence may raise a strong suspicion of appellant's guilt, nevertheless, standing alone, it is insufficient to establish a person's guilt beyond a reasonable doubt. The judgment of the court of appeals was reversed, and a judgment of acquittal is entered.

The Court stated like our sister courts across the country, we now hold that scent-discrimination lineups, whether conducted with individuals or inanimate objects, to be separate and distinct from dog scent tracking evidence. "Even the briefest review of the scientific principles underlying dog scenting reveals that, contrary to the conclusions of many courts, there are significant scientific differences among the various uses of scenting: "tracking, narcotics detection, and scent lineups." Andrew E. Taslitz, *Does the Cold Nose Know? The Unscientific Myth of Dog Scenting*, 42 HASTINGS L.J. 15, 42 (1990) (explaining that drug detection canines need only determine whether a specific scent is present. Tracking dogs, on the other hand, have the benefit of using both vegetative scents and human scent, while canines performing scent lineups must find one specific scent among many competing, similar scents). The FBI agrees, noting that tracking canines use human scent and environmental cues to locate the track of an

individual. Allison M. Curran, et al, *Analysis of the Uniqueness and Persistence of Human Scent*, 7 FORENSIC SCI. COMM. 2 (2005). Accordingly, we conclude that scent-discrimination lineups, when used alone or as primary evidence, are legally insufficient to support a conviction. Like the Supreme Court of Washington, we believe that "[t]he dangers inherent in the use of dog tracking evidence can only be alleviated by the presence of corroborating evidence." *Loucks*, 656 P.2d at 482. To the extent that lower-court opinions suggest otherwise, we overrule them and expressly hold that when inculpatory evidence is obtained from a dog-scent lineup, its role in the court room is merely supportive.

The Applicant contends that his Defense Trial Counsel lacked the necessary trial experience to try a murder case as complicated as his. It was discovered before trial that the Applicant's case would be the Defense Counsel's first murder trial.

Upon discovering this, the Applicant's trial attorney reassured the Applicant and his family that he would have a well experienced trial attorney to assist him in the Applicant's murder trial. The Applicant never met this experienced trial attorney on the day of trial, but met another inexperienced trial attorney that knew less than Mr. Oneal, who was the lead counsel at trial. Because of the Defense Counsel's lack of trial experience, he failed to preserve errors at trial by not properly objecting to questionable evidence that were offered at his trial.

When taking the totality of Defense Counsel's failures in challenging the scent lineup based on scientific standards set out in *Kelly v. State*, his failure in protecting and preserving the Applicant's trial record by properly objecting to questionable key evidence, his failure to investigate or challenge Deputy Pickett's credibility and reliability as an expert witness in the field of scent discrimination lineups. By the many different combinations of Defense Counsel's lack of trial experience rendered him ineffective in assisting the Applicant.

It is clear that the Applicant's trial attorney by his failure to have a Kelly Hearing to protect or reserve the Appellant's fundamental rights against this type of evidence or testimony rendered the Applicant ineffective assistance of counsel. It is apparent that the Applicant's trial attorney did not research the area of the criteria for assessing reliability of scientific evidence or investigate the credibility and reliability of the prosecution's expert witness, Deputy Pickett.

If the Applicant's Defense Counsel would have investigated Deputy Pickett's credibility and reliability to testify as an expert witness in the field of dog scent lineups, he would have found that Deputy Pickett's testimony would not be considered reliable due to the many inadequacies in his training methods as a dog handler, that he had no verification or records of his test results, nor was his bloodhounds certified in the field. That Deputy Pickett committed perjury related to his education in two other court proceedings; Deputy Pickett's scent

discrimination lineups have been proven wrong in other cases; Deputy Pickett has been ruled unreliable by another trial court of the same jurisdiction; and dog scent evidence has been proven wrong and unreliable in other jurisdictions in the country. Further Keith Pickett testified that there was a possible cross-contamination of the scents in the lineup in question; Keith Pickett did not run a "blind" scent lineup in the instant case without the defendant; Keith Pickett does not keep complete records on the scent lineups that his dos have participated in; Keith Pickett's training records regarding the dog's training are incomplete; Keith Pickett's failure to maintain records makes it difficult to determine accuracy or error rates; and Keith Pickett's "records" were not subject to peer review.

Texas Rules of Evidence 702, governing admission of expert testimony, provides:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

TEX.R. EVID. 702. A proponent of scientific evidence must show by clear and convincing proof that the proffered evidence is sufficiently relevant and reliable to assist a fact finder in determining a fact issue or understanding the evidence. See *Weatherred*, 15 S.W.3d—, 2011 WL 480600, at *3 (Tex.App.-Houston 14th Dist.] Feb. 10, 2011, no pet.

This case clearly shows that interpretation of a dog's reaction to a scent lineup is based on training and experience rather than scientific principles; we apply the "less rigorous" test set forth in *Nenno v. State*, 970 S.W.2d 549, 561 (Tex.Crim.App.1998). Under this standard in *Nenno*, a court considers whether (1) the field of expertise is legitimate, (2) the subject matter of the expert's testimony is within the scope of the field, and (3) the expert's testimony properly relies on or utilizes the principles involved in the field. *Nenno*, 970 S.W.2d at 561, *Winston*, 78 S.W.3d at 526; see also *Smith,* — S.W.3d—, 2011 WL 480600, at *3.

In *Winston*, the *Nenno* standard to dog scent lineups, our court set forth three factors for a court to consider when deciding whether the third *Nenno* prong has been satisfied (1) qualifications of the particular trainer (2) qualifications of the particular dog; and (3) objectivity of the lineup. *Winston*, 78 S.W.3d at 527.

The proper standard by which to gauge the adequacy of representation by counsel is articulated in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed. 674 (1984). See also *McFarland v. State*, 928 S.W.2d 482, 499-500 (Tex.Crim.App.1996). To determine whether counsel's representation was so inadequate as to violate a defendant's Sixth Amendment right to counsel, an appellant must first show that counsel's performance was deficient, i.e., that his assistance fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068; *McFarland*, 928 S.W.2d at 500, Second, assuming an

33

appellant has demonstrated deficient assistance, he must also affirmatively prove prejudice. See *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068; *McFarland*, 928 S.W.2d at 500. A "professionally unreasonable" error by trial counsel does not require a reversal if the error had no effect on the judgment. *Strickland*, 466 U.S. at 693, 104 S.Ct. at 2067. A reasonable probability is a probability sufficient to undermine confidence in the outcome. McFarland v. State, 845 S.W.2d 824, 842-43 (Tex.Crim.App.1992).

Therefore, in any case considering the issue of ineffective assistance of counsel, we begin with the strong presumption that counsel was effective. See *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065; *Jackson v. State*, 877 S.W.2d 768, 771 (Tex.Crim.App.1994). The appellant has the burden of rebutting this presumption. *Thompson v. State*, 9 S.W.3d 808, 812 (Tex.Crim.App.1999); *Kemp v. State*, 892 S.W.2d 112, 115 (Tex.App.-Houston [1st Dist.] 1994, pet. ref'd). To do so, the appellant must (1) identify the acts or omissions that are alleged to constitute ineffective assistance, and (2) affirmatively prove they fall below the professional norm for reasonableness. *McFarland*, 928 S.W.2d at 500. Any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Id.* In the absence of a proper evidentiary record developed at a hearing on a motion for new trial, it is extremely difficult on direct appeal to show that trial counsel's performance was

deficient. *Gibbs v. State*, 7 S.W.3d 175, 179 (Tex.App.-Houston [1st Dist.] 1999, pet. ref'd). An appellant must prove ineffective assistance by a preponderance of the evidence. *McFarland*, 845 S.W.2d at 843.

It is well established that a criminal defense lawyer must have a firm command of the facts of the case as well as governing law before he can render reasonably effective assistance to his client-in or out of the courtroom. Ex parte *Duffy*, 607 S.W.2d 507, 516 (Tex.Cr.App.1980); *Flores v. State*, 576 S.W.2d 632, 634 (Tex.Cr.App.1978); *Ex parte Ewing*, 570 S.W.2d 941, 947 (Tex.Cr.App.1978); see also *Herring v. Estelle*, 491 F.2d 125, 128 (CA5 1974); *Caraway v. Beto*, 421 F.2d 636, 637 (CA5 1970); *Williams v. Beto*, 354 F.2d 698, 705 (CA5 1965). In the seminal decision of *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), the Supreme Court recognized that a thorough factual investigation is the foundation upon which effective assistance of counsel is built:

> "It is not enough to assume that defense counsel thus precipitated into the case thought there was no defense, and exercised their best judgment in proceeding to trial without preparation. Neither they nor the court could say what a prompt and thorough-going investigation might disclose as to the facts. No attempt was made to investigate."

Powell at 287 U.S. at 58, 53 S.Ct. at 60, 77 L.Ed. at 165. Justice Sutherland writing for the Court in Powell emphasized:

> "The prompt disposition of criminal cases is to be commended and encouraged. But in reaching that result a defendant, charged with a

serious crime, must not be stripped of his right to have sufficient time to advise with counsel and prepare his defense. To do that is not to proceed promptly in the calm spirit of regulated justice but to go forward with the haste of the mob."

Powell at 287 U.S. at 59, 53 S.Ct. at 61, 77 L.Ed. at 166.

As this Court reiterated in Ex parte Duffy, 607 S.W.2d at 517, regardless of the complications in a particular case, counsel is charged with making an independent investigation of the facts of the case, *Flores v. State*, supra, eschewing wholesale reliance in the veracity of his client's version of the facts, *Ex parte Ewing*, supra, at 947. See also *Rummel v. Estelle*, 590 F.2d 103, 104 (CA5 1979), aff'd. on other grounds, 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980) (counsel must make an independent examination of the facts, circumstances, pleadings and laws involved).

A natural consequence of this notion is that counsel also has a responsibility to seek out and interview potential witnesses, see, e.g., *Davis v. Alabama*, 596 F.2d 1214, 1217 (CA5 1979); *Harris v. Estelle*, 487 F.2d 1293, 1299 (CA5 1974); *Williams v. Beto*, 354 F.2d 698, 702-703, and failure to do so is to be ineffective, if not incompetent, where the result is that any viable defense available to the accused is not advanced. See *Ex parte Duffy*, supra; *Brooks v. Texas*, 381 F.2d 619, 625 (CA5 1967) and *Smotherman v. Beto*, 276 F.Supp. 579, 590 (N.D.Tex.1967).

36

In light of these authoritatively declared duties and responsibilities, Applicant's Defense Counsel failed to render effective assistance of counsel. Likewise, its reasoning is equally applicable to this Applicant's case for his trial. Defense Counsel failed to conduct a Kelly Hearing outside the presence of a jury. For his failure not to file a motion to suppress scientific evidence pertaining to the dog scent lineup nor properly investigating or challenging the credibility and reliability of Deputy Pickett's testimony at trial, clearly renders the Applicant ineffective assistance of counsel, which he was fundamentally due. By the Applicant's trial counsel challenging or objecting to this line of testimony or evidence being introduced to the jury, the State relied primarily on this evidence of scent lineup to convict the Appellant.

In *Ex parte Duffy*, 607 S.W.2d at 521, the Court referred to the California Court of Appeals case, *People v. Corona*, 145 Cal.Rptr. 894, 911-912, 917-918, 80 Cal.App.3d 684, 724 (1978), and found the California court's reasoning cogent. It states that "The very vice of the procedure followed by trial counsel was his failure to properly investigate and develop facts which could have or would have given rise to the defense in question (insanity). Also, since the facts remained uncovered and undetected, there is no way of telling whether those facts, if fully developed, would or would not have established the defenses in dispute. If the record on appeal is defective or incomplete, it is due solely to the neglect of trial counsel.

In such circumstances we may not save the judgment by speculating whether the defense would have been successful, regardless of the apparent strength of the prosecution's evidence, a trial in which only one side of the case is heard is "fundamentally unfair" and hence constitutes a denial of due process of law. Such a conviction cannot stand." *People v. Corona*, supra, 145 Cal.Rptr. at 917-918 (citations omitted).

### III. The Applicant contends that the evidence was legally and factually insufficient to uphold his conviction.

The Applicant alleges that the evidence presented at his trial was legally and factually insufficient to sustain his conviction. The Applicant is further requesting that the court review the legal and factual sufficiency of the evidence supporting a conviction under well-established standards.

In conducting the legal sufficiency review, it is to consider the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Sanders v. State*, 119 S.W.3d818, 820 (Tex.Crim.App.2003). The court must give deference to "the responsibility of the trier of fact to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex.Crim.App.2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 318-19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). We are not required to determine whether to believe that the evidence at trial established guilt beyond a reasonable doubt; rather, when faced with conflicting evidence, we must presume that the trier of fact resolved any such conflict in favor of the prosecution, and we must defer to that resolution. *State v. Turro*, 867 S.W.2d 43, 47 (Tex.Crim.App.1993).

In conducting a factual sufficiency review, it is to consider the evidence in a neutral light. *Watson v. State*, 204 S.W3d 404, 414-15 (Tex.Crim.App.2006). The verdict will be set aside only if it is (1) so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust, or (2) against the great weight and preponderance of the evidence. *Id.* At 415 (citing *Johnson v. State*, 23 S.W.3d 1, 10 (Tex.Crim.App.2000)).

The Applicant contends that if we were to exclude the testimony and evidence of the dog scent lineup, that there would not be enough sufficient legal evidence to maintain his conviction. The Applicant states that the testimony of Marcus Wright and Ashton Winters, who testified at trial, that they witnessed the Applicant shoot the Complainant to death. The Applicant further contends that both of their testimonies are in direct conflict with the testimonies of Hershel Cartwright and the Applicant about who actually shot and killed the Complainant. Both the Applicant and Hershel Cartwright testified that Marcus Wright was the person that shot the Complainant.

The Applicant further that the testimonies of the two alleged eye witnesses to the shooting contradict the physical evidence found on the Complainant's body. Both Wright and Winters testified that they saw the Applicant and deceased in a heated argument and that they both testified that they saw the Applicant pull out a gun and shot the Complainant several times in the chest.

The physical evidence found on the Complainant's body during the autopsy revealed that the Complainant had some blunt trauma injuries, bruises, snd abrasions indicating that he had been in a fight before being shot and killed.

Dr. Dwayne Wolf, a Harris County Medical Examiner, was the doctor that performed the autopsy and who examined the body. Dr. Wolf testified that the deceased had injuries to his head, face, and hands showing that the deceased was in an apparent fight. Dr. Wolf also testified that the fight occurred before the shooting because the Complainant received too many fatal shots which would have made it impossible to receive those injuries after the shooting.

The Applicant contends that both Wright and Winters testified that they witnessed the argument between the Complainant and the Applicant but neither one testified that they saw a fight between the two of them. To the contrary, both the Applicant and Cartwright testified that they witnessed a fight between Marcus Wright and the deceased.

Dr. Dwayne Wolfe testified as to the following:

Page 39

Q. Doctor, will you introduce yourself to the jury, please.
A. I'm Dr. Dwayne Wolf.

Page 40

Q. As a medical examiner, you stated that part of your duties is to perform autopsies. What is an

41

autopsy?

A. An autopsy is an examination of a dead body. Our examination begins with the body as it's received from either the scene or the emergency room. During the

Page 45

Q. Okay. How many gunshot wounds in this case were found in the decedent's body?

A. There were a total of eight separate gunshot wounds. Two of those were probably part of the same

Page 46

Q. Would Gunshot Wound No. 1 have been a fatal wound?

Page 52

Q. (BY MS. EMMONS) Dr. Wolf, were there any other injuries associated with the decedent at this time?

A. He had some blunt trauma injuries, bruises and abrasions.

A. There were several on the head. There was also one on the right hand.

Page 54

A. Well, multiple of these gunshot wounds passed through vital structures, the lungs, as well as the heart and some of the major blood vessels in the body. He would have lost consciousness fairly quickly after these gunshot wounds, within a matter of seconds. But he may have been unable to fight back almost immediately from the time of the shots.

Page 55

BY MR. OUGRAH:

42

Q. What we can tell, though, from the autopsy report is that it was more than just arguing, and it was an altercation of some sort that took place prior to the shooting, correct?

A. Right, he's got blunt trauma in addition to the gunshot wounds.

Q. He also had blunt trauma on his hands, correct?

A. On one of the hands, yes.

Q. One hand, right, which we could also sugest that he fought back?

Page 56

A. Yeah, perhaps.

Q. You spoke about the butt of the gun hitting him on the head, correct? Could there have been or is t possible that there could have been a bottle or some object that could have been used to hit him on the head?

A. Yeah, it's a pattern injury. It was a rounded object.

43

## PRAYER

For these reasons, Applicant asks that the Court grant this writ of mandamus.


/s/ Augustin T. Pink

**STATE OF TEXAS** §
**HARRIS COUNTY** §

## UNSWORN DECELRATION

My name is AUGUSTIN T. PINK, my address is 2646 South Loop West #195, Houston, Texas 77054. My date of birth is March 1, 1964, I am over 18 years of age, of sound mind, and capable of making this affidavit; and I swear under the penalty of perjury that the facts contained in this affidavit are within my personal knowledge and are true and correct.

1.   I am the attorney for relator.  All the documents included with the petition for writ of mandamus are true copies."


_/s/ Augustin T. Pink___
Augustin T. Pink

**CERTIFICATE OF WORD COUNT**

This is to certify that this writ of mandamus contains approximately 14,933 words.


/s/ Augustin T. Pink
Augustin T. Pink

**CERTIFICATE OF SERVICE**

I certify that I served by Certified US Mail Return Receipt Requested on November 25, 2015, a copy of this Writ of Mandamus on the following parties:

a.  The attorney for State of Texas, Assistant District Attorney Anna Emmons Kasper, 1201 Franklin, Suite 600, Houston, Texas via hand delivery.

d.  The respondent, the Honorable Mike Anderson, judge of the 262th Judicial District Court of Harris County, Texas, via hand delivery.

/s/ Augustin T. Pink
Augustin T. Pink